**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CMFG LIFE INSURANCE COMPANY,<br>    *Plaintiff*,<br><br>v.<br><br>ASHLEY NANCE,<br>    *Defendant*. | No. 24-cv-01034-ABA |

**MEMORANDUM OPINION AND ORDER**

Plaintiff CMFG Life Insurance Company ("CMFG") seeks to void a life insurance policy that names Defendant Ashley Nance as beneficiary. Because the record shows no genuine factual dispute that Ms. Nance caused the policy to be procured and did not have a substantial economic interest in the insured when the policy issued, the Court will grant summary judgment in favor of CMFG.

## I. BACKGROUND[1]

This case concerns an insurance policy on the life of Guy Martin, who died in 2023. Mr. Martin and Ms. Nance, the Defendant, became romantic partners in June 2021. ECF No. 51-9 at 9. In September 2021, the couple began residing together and applied for life insurance on Mr. Martin from CMFG. *Id*. at 17; ECF No. 51-3 at 5. The policy's coverage amount was $300,000 and listed Ms. Nance as the beneficiary. ECF No. 51-3 at 14. Ms. Nance testified that the rationale behind the purchase was to assist

---

[1] On a motion for summary judgment, the Court "must construe the evidence in the light most favorable to the non-moving party." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 958 (4th Cir. 2021). The Court will construe the record in the light most favorable to Ms. Nance for purposes of CMFG's summary judgment motion.

1

her in buying a larger property. ECF No. 51-9 at 11. Mr. Martin applied for the policy under his own name and initially owned it. ECF No. 51-3 at 5, 15. But Ms. Nance filled out the application on her laptop with Mr. Martin next to her, as she was better with computers and Mr. Martin had given her permission to assist. ECF No. 51-9 at 13–15.

The policy listed Ms. Nance's phone number, email address, and physical address as the relevant contact information, as well as her bank account information. ECF No. 51-3 at 14–15; ECF No. 51-9 at 16–23. Ms. Nance also spoke with representatives for CMFG after issuance to clarify details of the policy and payment, identifying herself as the "payor." ECF No. 51-4. Ms. Nance paid the monthly premiums on the policy from her account, but maintains that Mr. Martin contributed $3,884 in cash towards the payments. ECF No. 51-12 at 6; ECF No. 51-15; ECF No. 51-9 at 25–26. In November 2022, Mr. Martin assigned ownership of the policy to Ms. Nance. ECF No. 51-6. The couples' intention was always for Ms. Nance to "handle the policy and manage it," and if there had been a space on the application to list Ms. Nance as the owner "different from [the] insured," they would have done so. ECF No. 51-9 at 58.

As discussed below, the financial relationship between Ms. Nance and Mr. Martin is relevant to the validity of the policy. Ms. Nance began living with Mr. Martin in his apartment starting in September 2021, and had occasionally stayed with him in the months prior. ECF No. 51-9 at 8; ECF No. 51-12 at 6. Ms. Nance also owned her own separate property.[2] ECF No. 53-1 at 1. Mr. Martin received income through Social

---

[2] At the hearing, counsel for Ms. Nance stated that she owned a separate property, which she rented out while she was living with Mr. Martin. Counsel conceded that the amount of rental income was not in the summary judgment record. The fact that Ms. Nance rented out her property in the first place does not appear to be in the summary

Security benefits. Ms. Nance testified that Mr. Martin also sometimes worked as a mechanic and had roughly $28,000 in cash savings. ECF No. 51-9 at 29, 44. Mr. Martin had previously been homeless and lived in low-income housing. *Id.* at 44. His bank account records show balances mostly in the hundreds of dollars. ECF No. 51-13. Ms. Nance paid the majority of her own bills, though Mr. Martin would sometimes contribute money for "entertainment" expenses. ECF No. 53-4 ¶ 7. Ms. Nance, Mr. Martin, and Joan Spence (Ms. Nance's mother) bought a property together in November 2022. The deed lists the three owners as joint tenants with rights of survivorship. ECF No. 53-2 at 1.

After Mr. Martin died in 2023, CMFG sued in this Court in April 2024 seeking a declaratory judgment that the life insurance policy was void *ab initio* and that CMFG's "sole obligation relating to the Policy is to return to Nance premiums that have been paid for the Policy, which CMFG has done." ECF No. 1-5 at 8. Ms. Nance subsequently filed a counterclaim for fraudulent misrepresentation, ECF No. 13 at 16, which this Court dismissed upon CMFG's motion for failure to state a claim, ECF Nos. 22, 44. The Court also denied Ms. Nance's motion for judgment on the pleadings. ECF No. 48. Following discovery, the parties both moved for summary judgment. ECF Nos. 51, 53. Those motions are now fully briefed, and the Court held a hearing on December 15, 2025. ECF No. 62.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

judgment record either. But the Court assumes that she did in fact own separate property and rented it out whole she was living with Mr. Martin.

56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotox*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita*, 475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 277 (4th Cir. 2024) (quoting *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011)). Here, the Court will only construe the evidence in the light most favorable to Ms. Nance because, even upon doing so, CMFG is entitled to summary judgment.

### III.   DISCUSSION

#### A.   Maryland's insurable interest statute

"Maryland law has long prohibited anyone, other than one with an insurable interest, from insuring another person's life." *Hopkins v. Hopkins*, 328 Md. 263, 268

4

(1992); *see also Rittler v. Smith*, 70 Md. 261 (1889) ("[O]ne who has no insurable interest in the life of another cannot insure that life. Such insurances are considered gambling contracts, and for that reason void at common law[.]"). The Maryland legislature codified the common law insurable interest doctrine as Md. Code Ann., Ins. § 12-201. *See Beard v. Am. Agency Life Ins. Co.*, 314 Md. 235, 244–45 (1988).

The insurable interest statute first establishes that "[a]n individual of competent legal capacity may procure or effect an insurance contract on the individual's own life or body for the benefit of any person." *Id.* § 12-201(a)(1). But if someone other than the insured "procure[d]" the policy or "cause[d] [it] to be procured," the analysis gets more complicated:

> [A] person may not procure or cause to be procured an insurance contract on the life or body of another individual unless the benefits under the insurance contract are payable to:
>  (i) the individual insured;
>  (ii) the individual insured's personal representative; or
>  (iii) a person with an insurable interest in the individual insured at the time the insurance contract was made.

*Id.* § 12-201(a)(2). Both sides in this case agree that Ms. Nance falls into category iii, as she was not Mr. Martin himself or his personal representative.

For persons in that category, the statute goes on to define the "insurable interest" requirement. Those "related closely by blood or law" to the insured pass the requirement almost automatically, as they are presumed to have "a substantial interest engendered by love and affection." *Id.* § 12-201(b)(2)(i). Although persons *not* related by blood or law frequently do share love and affection, the statute requires more. Persons unrelated to the insured, such as Ms. Nance, must also show "a lawful and substantial *economic* interest in the continuation of the life, health, or bodily safety of the individual." *Id.* § 12-

5

201(b)(3) (emphasis added). The statute goes on to specify that "an interest that arises only by, or would be enhanced in value by, the death, disablement, or injury of the individual is not an insurable interest." *Id.*

These provisions simplify into two questions as applied to the policy at issue here. First, did Ms. Nance "procure or cause to be procured" the life insurance policy? If not, Ms. Nance would likely prevail, as the statute would not limit Mr. Martin's ability to, acting alone, procure a policy on his own life. If Ms. Nance did procure the policy or cause it to be procured the analysis moves to question 2: did Ms. Nance have a "substantial economic interest" in Mr. Martin's life? If yes, then Ms. Nance would likely still prevail; if no, then CMFG would.

### B. Did Ms. Nance cause the insurance policy to be procured?

As discussed above, the first question is whether Ms. Nance procured the life insurance policy or caused it to be procured. Ms. Nance's argument is straightforward: Mr. Martin procured the insurance because he owned the policy, the application was submitted under his name and signature, and he paid some initial premiums. ECF No. 53 at 5–7. CMFG contends that the matter is not that simple. Because Ms. Nance filled out the application, managed the policy, and largely paid for it, she procured it or at least was responsible (in part) for causing the policy to be procured. CMFG primarily cites two cases in support of its position. (Ms. Nance has not cited any additional authority, and the Court's own research has not revealed any other Maryland cases bearing on this issue.)

First, in *Beard v. American Agency Life Insurance Co.*, 314 Md. 235 (1988), the Supreme Court of Maryland held that an insurance policy taken out by a tenant farmer

(Beard) on his landlord's life was void for lack of an insurable interest.³ The landlord had been the person who suggested buying the policy. *Id.* at 240. Both parties signed at least one application document and both participated in the application process, though Beard was listed as the owner of the policy. *Id.* at 241. The *Beard* court's opinion assumes that Beard had procured or caused the insurance to be procured, as the analysis deals only with the insurable economic interest issue. While this scenario has some parallels to this case, there are also distinctions. Beard (the beneficiary) was the "owner of the policy," unlike Ms. Nance. *Id.* at 241. Further, the parties did not dispute (at least at the appellate stage) that Beard had procured the insurance, and the court thus did not address the meaning of "procure or cause to be procured."

The other case the parties primarily discuss, *Ohio National Life Assurance Corp. v. Jones*, Case No. 09-cv-2044-CCB, 2010 WL 2302360 (D. Md. June 7, 2010), involved an insurance policy on the life of a man who listed a woman identified as his niece as the beneficiary. *Id.* at *1–2. Judge Blake of this Court, applying Maryland law, held that there was a factual dispute regarding who had procured the insurance policy. *Id.* at *4. The insurer had alleged in its complaint that the insured "was learning disabled and unable to read or write" and that the beneficiary "was present when the Policy was procured and paid all the Policy premium," so it was "plausible that [the beneficiary] played an affirmative role in procuring the Policy." *Id.* There are again parallels to CMFG's case here, but also distinguishing factors. CMFG has not alleged that Mr.

---

³ *Beard* dealt with a precursor insurable interest statute, Md. Code Art. 48A § 366(a). The current statute, Md. Code Ann., Ins. § 12-201, was derived from the precursor in 1996 "without substantive change." *See* 1995 Maryland Laws Ch. 36 (H.B. 11), Revisor's Note to § 12-201.

7

Martin had any cognitive or other health issues that affected his competency to procure the insurance. And the court in *Jones* merely held at the pleadings stage that there was a dispute regarding procurement, rather than finding more conclusively on a post-discovery record that the beneficiary's actions had caused the policy to be procured.

Despite these distinguishing elements, these cases taken together suggest that a beneficiary who is closely involved in the insurance application process can be subject to the insurable interest requirement under the "cause to be procured" clause. In both cases, the application process was a joint effort between the insured and the beneficiary. In *Beard*, both individuals made the plan to take out life insurance and both signed the application. 314 Md. at 679. In *Jones*, the beneficiary was "present when the Policy was procured," paid the premiums, and was involved in communicating with the insurance company. 2010 WL 2302360 at *1–2. These facts led the *Jones* court to conclude that there was a dispute regarding whether the beneficiary had "an affirmative role in procuring the Policy," which was enough for the insurance company to defeat the beneficiary's motion to dismiss. *Id.* at *4.

The plain meaning of the insurable interest statute also suggests that the "procurement" requirement is broader than merely asking whose name is listed on the application as the policyholder, as Ms. Nance suggests. "To ascertain the intent of the General Assembly, our analysis begins with the normal, plain meaning of the language of the statute. . . . 'If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, [the] inquiry as to legislative intent ends ordinarily and [the Court] appl[ies] the statute as written." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021) (quoting *Lockshin v. Semsker*, 412 Md. 257, 275 (2010)). The relevant provision states that "a person may not procure or **cause to be procured** an

8

insurance contract on the life or body of another individual" unless the specified conditions are met. Md. Code Ann., Ins. § 12-201(a)(2) (emphasis added). The statutory language includes both a verb ("procure") and a construction reflecting an intent to encompass circumstances where more than one person is involved in procuring a policy ("cause to be procured"). After all, an event—here, the purchase of the policy—can have multiple causes.

     Here, the evidence in the light most favorable to Ms. Nance reflects that she had at least some role in causing the policy to be procured. She was the one who filled out the application, and she testified that it was both her and Mr. Martin's intention that she manage the policy. ECF No. 51-9 at 13–15, 58. To that end, she communicated with CMFG about the policy and payment details and identified herself as the payor. ECF No. 51-4. Though Mr. Martin paid some premiums, Ms. Nance paid the majority of them, and all of the payments came from Ms. Nance's bank account. ECF No. 51-9 at 25–26. Further, Ms. Nance testified that the subsequent assignment of the policy to her was done to effectuate the parties' intentions from the start that she own the policy. *Id.* at 58. Although an assignment of a validly procured life insurance is permissible, that "does not preclude this court from considering a transfer of ownership as evidence of the parties' intent at the time of procurement." *Jones*, 2010 WL 2302360, at *4 n.3. On this record, even drawing every reasonable inference in the nonmovant's favor, there is no genuine factual dispute that Ms. Nance was among the persons (Ms. Nance and Mr. Martin) who caused the insurance to be procured.

     Because Ms. Nance is the named beneficiary, and because the General Assembly required an insurable interest whenever a named beneficiary was among the persons who "cause[d]" a life insurance "to be procured," and because the undisputed evidence

9

establishes that Ms. Nance, in part, caused the policy to be procured, the policy is only valid if it was secured by an insurable interest at the time Ms. Nance and Mr. Martin procured it.

### C. Did Ms. Nance have an insurable economic interest in Mr. Martin's life?

Because Ms. Nance was one of the persons who caused the life insurance policy to be procured, the policy is only valid if she had an insurable interest in Mr. Martin's life. Neither party contends that Ms. Nance, who was Mr. Martin's life partner, was "closely related" to Mr. Martin "by blood or law." Md. Code Ann., Ins. § 12-201(b)(3). Thus, the Policy is only valid if she had "a lawful and substantial economic interest in the continuation of the life, health, or bodily safety" of Mr. Martin. *Id.* Of course, those in romantic partnerships have a personal interest in the life, health, and safety of their partners, as Ms. Nance no doubt had in Mr. Martin's. But that is not the relevant question under the statute.

Under the Maryland cases that interpret this provision (primarily, the *Beard* case already described above), an insurable economic interest is "a reasonable expectation of *pecuniary* benefit or advantage from the continued life of another." *Beard*, 341 Md. at 246 (emphasis added). This requires Ms. Nance, as the named beneficiary, to show that she would be "better off *from the standpoint of money*" if Mr. Martin had survived than if he had died—*i.e.*, that she "would . . . enjoy more substantial economic returns should the insured continue to live" than she would receive "in the form of the proceeds of the policy should the insured die." *Id.* at 246–47 (emphasis added). In undertaking this analysis, courts also look to the "loss or disadvantage" to the beneficiary that "will naturally and probably arise[] . . . from the death of the person whose life is insured. *Id.*

10

at 247 (quoting *Cooper's Adm'r v. Lebus' Adm'rs,* 90 S.W.2d 33, 36 (Ky. 1935)). As the Georgia Supreme Court put it in interpreting a similar statute, "a person has an insurable interest in the life of another if [the beneficiary] can reasonably expect to be better off financially if the life continues, and worse off if it ends." *Crum v. Jackson Nat'l Life Ins. Co.*, 315 Ga. 67, 73 (2022). The analysis examines the beneficiary's interest "at the time of the procurement of life insurance" because the statute requires an insurable interest at that time. *Nat'l Life Ins. Co. v. Tower*, 251 F. Supp. 215, 221 (D. Md. 1966), *aff'd in part, rev'd in part (on other grounds) sub nom. Maryland National Bank v. Tower*, 374 F.2d 381 (4th Cir. 1967).

Applying these standards, there is no genuine dispute that Ms. Nance lacked a substantial economic interest in Mr. Martin's life. The record indicates that in September 2021, when the policy was procured, Mr. Martin primarily received income from Social Security. *See* ECF No. 51-10 at 37 (Mr. Martin's tenant income certification stating that in February 2021, he had $250 in total assets and received $7,716 in annual income only from Social Security). Although Ms. Nance testified that Mr. Martin worked as a mechanic and had approximately $28,000 in cash stored in his apartment, ECF No. 51-9 at 29–31, his bank account contained no more than $2,604.47 between December 2020 and January 2024. ECF No. 51-13 at 136. And even assuming that Mr. Martin received income from his mechanic work and had cash savings, there is no record evidence from which a juror could infer that Ms. Nance received regular, significant financial support from Mr. Martin, or that she had a reasonable expectation of future financial support in September 2021. The relevant evidence establishes that Mr. Martin's only regular financial contribution was for Ms. Nance's "entertainment expenses." ECF No. 53-4 ¶ 7. Ms. Nance may have expected *some* future money from

11

Mr. Martin as of September 2021. But considering Mr. Martin's age along with his limited savings and income, this expectation was not in reasonable proportion to the $300,000 coverage amount. *See Tower,* 251 F. Supp. at 221 ("[T]here cannot be gross disproportion between the value of the interest protected and the amount of coverage or the insurance contract will be deemed against public policy as a wagering contract.").

Ms. Nance points to three primary facts to demonstrate her economic interest. ECF No. 53 at 9. None is sufficient to generate a genuine dispute of material fact under the relevant legal standard.

First, Ms. Nance argues that she and Mr. Martin lived together "continuously for two years" and "shared household expenses, with Guy Martin contributing financial support throughout." ECF No. 53 at 9. But Ms. Nance only began living with Mr. Martin in September 2021, the same month she procured the life insurance. ECF No. 51-9 at 8. And Ms. Nance did not even live with Mr. Martin continuously for the entire month of September 2021. ECF No. 51-12 at 6. At the time of issuance, the record does not indicate that Ms. Nance had a reasonable expectation of continued financial support related to household expenses. Even if the Court were to consider such expenses, Ms. Nance's mother Ms. Spence, in her affidavit, stated that "Ashley Nance handled the majority of her bills on her own," though "Guy Martin habitually paid for all entertainment-related expenses." ECF No. 53-4 ¶ 7. Ms. Spence also states that Ms. Nance "had a place of her own." *Id.*; *see also* ECF No. 53-1 at 1 (Ms. Nance testifying that she owns a home in Silver Spring, Maryland). In summary, Ms. Nance did not have a substantial economic expectancy from Mr. Martin related to household expenses.

At the hearing, Ms. Nance's counsel suggested that she also derived economic value from relying on Mr. Martin as a "live-in personal assistant," characterizing a

12

tangible benefit that most co-habitating partners or spouses enjoy. Again, however, Ms. Nance and Mr. Martin began living together at essentially the same time as they procured the life insurance policy. Further, Ms. Nance's testimony would not allow a reasonable juror to infer that she expected significant value from Mr. Martin's assistance. Mr. Martin was 66 years old when the policy was procured. ECF No. 51-3 at 5. Ms. Nance testified that she assisted Mr. Martin with doctors' appointments and other needs, stating "Guy at the time, 66 years old, he's going to be a little bit slower with doing things and I can do something in two minutes where it may take him 20 minutes. So if I want something done faster, I have people communicate with me and then I relay messages to him." ECF No. 51-9 at 19. She further testified, "I assisted Guy Martin with a lot of matters and I would use my phone number on some of his paperwork or his applications and my email. And people may have communicated with me through my e-mail for him or my phone for him because I'm faster at getting things done." *Id.* at 21. Even when construing the evidence in the light most favorable to Ms. Nance, this record does not support any inference that she gained significant financial benefit from Mr. Martin's services in September 2021 or could have reasonably expected such benefit in the future proportionate to the $300,000 coverage amount. If anything, Ms. Nance's testimony could only support the inference that Mr. Martin economically benefitted from her assistance.

Second, regarding the real estate purchase by Ms. Nance, Ms. Spence, and Mr. Martin, this occurred after the policy was issued. The deed is dated November 2022, over one year after Ms. Nance was required to have an insurable interest, in September 2021. ECF No. 53-2 at 1. Even if the purchase had not taken place well after the policy was issued, and even assuming that Mr. Martin contributed to mortgage payments (to

13

be clear, there is no record evidence to support such an inference), that would still not be sufficient for a substantial economic interest. The deed lists the three purchasers as joint tenants with rights of survivorship. *Id.* Thus, even if Ms. Nance's mortgage payments would have increased after Mr. Martin's death, her equity in the property would have also increased by the same proportion. *See Cooper v. Bikle*, 334 Md. 608, 621 (1994) ("[I]f property is held by joint tenants and one of the tenants dies, that individual's interest in the property is immediately extinguished. The surviving joint tenant becomes the sole owner of the property pursuant to the right of survivorship and without the necessity of probate.").

Finally, Ms. Nance argues that she was Mr. Martin's primary decision-maker pursuant to an Advanced Medical Directive. ECF No. 53-3. But this fact has no bearing on Ms. Nance's *economic* interest in Mr. Martin's life.

In summary, Ms. Nance did not have a substantial economic interest in Mr. Martin's life. The $300,000 she would stand to receive from her life insurance policy far outweighs any expectation she had regarding Mr. Martin's financial support. Thus, Ms. Nance had no insurable economic interest to support the life insurance policy as required by Maryland law.

### IV. CONCLUSION AND ORDER

For the reasons stated above, the Court hereby ORDERS as follows:

1. Plaintiff's motion for summary judgment (ECF No. 51) is GRANTED;
2. Defendant's cross-motion for summary judgment (ECF No. 53) is DENIED;
3. Policy No. LC2162715 issued by CMFG Life Insurance Company, insuring the life of Guy A. Martin, is hereby declared void;

4. By returning to Ms. Nance the premiums paid for the policy, CMFG has satisfied its sole obligation relating to this policy;

5. The Clerk of Court is directed to mark this case as CLOSED.

Date:  January 7, 2026

_____/s/_____
Adam B. Abelson
United States District Judge